## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois,<br><br>        Plaintiff,<br><br>   v.<br><br>3M COMPANY, ET AL.,<br><br>        Defendants. | Civil Action No.   25-cv-4189<br><br><br>**NOTICE OF REMOVAL** |

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, to the United States District Court for the Central District of Illinois. As grounds for removal, 3M alleges as follows:

### PRELIMINARY STATEMENT

1.     This case belongs in federal court. 3M has a federal defense that entitles it to removal under the federal officer removal statute. But, in an effort to avoid litigating this case in federal court, the State of Illinois ("State") previously made an extraordinary concession to the Seventh Circuit—that if even a "morsel of contamination is not from PFAS produced" at the 3M facility in Cordova, Illinois ("Cordova Facility"), then "the State's recovery is barred." *Illinois ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024). Now, the State's own discovery responses reveal that it no longer intends to abide by its representations to the Seventh Circuit. In an about-face, the State now admits that it seeks to recover at sites near the Cordova Facility with PFAS contamination stemming from multiple sources, including in places that are also plausibly contaminated with PFAS from aqueous film-forming foam ("AFFF") manufactured pursuant to

military specifications ("MilSpec"). This extraordinary reversal, coupled with 3M's plausible allegations of PFAS contamination from MilSpec AFFF in at-issue natural resources near the Cordova Facility, means that 3M can present a colorable federal government contractor defense and is entitled to remove this case. *See id.*; *see also Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016).

\* \* \*

2.      AFFF is a firefighting foam that is highly effective for extinguishing fuel-based fires. At facilities on the banks of the Mississippi—both upriver and downriver from the Cordova Facility—MilSpec AFFF produced by 3M was plausibly discharged into the river. PFAS from that MilSpec AFFF commingled with PFAS from the Cordova facility, which itself is located along the banks of the Mississippi. And in particular, MilSpec AFFF used or otherwise released at the Savanna Army Depot (approximately 30 miles upstream from the Cordova Facility) and the Rock Island Arsenal (located approximately 25 miles downstream from the Cordova Facility) plausibly contributed to the contamination alleged by the State.

3.      Under the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), 3M is not subject to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product. On that basis, 3M previously removed this case three years ago. 3M alleged that some of the PFAS contamination in the Mississippi River plausibly came from MilSpec AFFF used or stored at the Rock Island Arsenal. This Court remanded this case to state court, and the Seventh Circuit affirmed.

4.      In reaching its decision, the Seventh Circuit observed that "[i]f the contamination came from AFFF, then the government contractor defense could apply." *Raoul*, 111 F.4th at 848. And this is true, under the Seventh Circuit's earlier decision in *Baker v. Atlantic Richfield Co.*, 962

2

F.3d 937 (7th Cir. 2020), even where a complaint "expressly excluded 3M for liability for PFAS contamination sourced from AFFF." *Raoul*, 111 F.4th at 848. That is because the "the parties' dispute over 'whether the plaintiffs' injuries arose from products the defendants manufactured for the government … is just another example of a difficult causation question that a federal court should be the one to resolve.'" *Id.* at 849 (quoting *Baker*, 962 F.3d at 945 n.3).

5.      The State strained to distinguish *Baker* and defeat removal. To that end, the State made a "clear[] and unequivocal[]" concession at oral argument before the Seventh Circuit. Specifically, the State represented "*that it would not seek relief from 3M for mixed PFAS contamination*" and "expressly agreed that a fact finder will not need to apportion the PFAS contamination between sources." *Id.* (emphasis added). The Seventh Circuit reasoned that, in light of these absolute concessions, the State had expressly limited its theory of recovery to only those areas where "100% of [the] contamination" was "sourced from the Cordova Facility." *Id.* In the face of this unequivocal representation by the State, the appellate court reasoned that the government contractor defense did not apply in this action. *Id*.

6.      Since this case was remanded, however, the State's verified discovery responses reveal that its representations to the Seventh Circuit are no longer accurate in two principal ways.

7.      *First*, the State now denies—in direct contravention of its prior representations and the Seventh Circuit's decision—that it must prove that 100% of the PFAS detected at or around the Cordova Facility is derived from non-AFFF PFAS from the Cordova Facility in order to establish liability. The State's concession on this point at oral argument could not have been clearer. When asked, "You have to prove that, whatever location you're talking about, that all of

3

the damage there arose from Cordova and nothing else?," counsel for the State responded, "That's correct." Exhibit A at 18:8–11.[1]

8.      In discovery responses that post-date the Seventh Circuit argument by over a year, the State now says instead that, even if other contamination is present, expert testimony can identify PFAS contamination caused by operations at the Cordova Facility. And according to the State, it need only establish that some PFAS contamination was caused by operations at the Cordova Facility. This revised "theory of recovery" flies in the face of the Seventh Circuit's holding that the "government contractor defense does not apply" because the State concedes that "3M is liable for PFAS contamination *only in areas where the contamination is wholly derived from the Cordova Facility*." *Raoul*, 111 F.4th at 849 (emphasis added).

9.      *Second*, with the exception of AFFF contamination from Rock Island Arsenal, the State now refuses to admit that it won't seek to recover where AFFF is present. In other words, the State admits that it seeks relief for alleged harm where PFAS derived from non-AFFF sources is plausibly alleged to be mixed with PFAS from the use or release of AFFF, just so long as the mixed AFFF did not originate from the Rock Island Arsenal. And the State now maintains that it will present expert testimony to try to rule out PFAS from the Rock Island Arsenal, but it need not rule out PFAS from sources other than the Rock Island Arsenal.

10.      Indeed, based on the State's discovery responses, it is clear that the State construes its oral argument representations as limited to a disclaimer of MilSpec AFFF *from the Rock Island Arsenal*. But that is neither what the State represented nor what the Seventh Circuit held. When pressed at oral argument, the State's concession was unmistakable: "this argument is the same

---

[1] Official audio available at https://media.ca7.uscourts.gov/sound/2024/dab.23-3031.23-3031_05_30_2024.mp3 (last visited Oct. 20, 2025).

whether … the something else that is 'not Cordova' that caused any given contamination. It doesn't matter whether that is MilSpec AFFF, whether 3M made it, or whether it's a completely different chemical . . .. If it's not from Cordova, then the State will not recover." Ex. A, 16:13–18. Based on that representation from the State, the Seventh Circuit held that "[i]f even a morsel of contamination is not from PFAS produced at the Cordova Facility (*such as* AFFF out of the Rock Island Arsenal), the State's recovery is barred." *Id.* at 849 (emphasis added). Rock Island was an example of a source of MilSpec AFFF, not the exclusive site the State needed to carve out in order to recover.

11.     Recent investigation by 3M has identified at least one additional site, the Savanna Army Depot (30 miles upriver from the Cordova Facility), at which MilSpec AFFF was used. And PFAS from the MilSpec AFFF used at the Savanna Army Depot plausibly commingled with the alleged PFAS contamination at sites for which the State seeks recovery in this case: those "at and around the Cordova facility – including, *without limitation*, to the surrounding land, water and natural resources; any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, and/or the Mississippi River – caused by PFAS contamination from the Cordova Facility." Exhibit E, The State's Responses and Objections to 3M's First Set of Requests for Admission ("RFA Responses"), at 5–6 (emphasis added). For example, PFAS from MilSpec AFFF have plausibly commingled in all areas of the Mississippi River for which the State seeks recovery from 3M in this action.

12.     The State's newly-narrowed concession in its RFA Responses, does not disclaim recovery for PFAS contamination from anywhere other than the Rock Island Arsenal, and thus does not reach PFAS contamination from MilSpec AFFF discharged from the Savanna Army Depot. Nor does the State's newly-narrowed concession disclaim recovery for PFAS in the

Mississippi River. This means that, under the State's new theory, the State seeks to recover for mixed PFAS contamination that plausibly includes PFAS from MilSpec AFFF used at the Savanna Army Depot or elsewhere.

13.    In light of the State's verified discovery responses and 3M's own investigation, it is now clear that the State seeks relief against 3M for mixed PFAS contamination, including in the Mississippi River, where MilSpec AFFF contamination from the Savanna Army Depot or elsewhere is plausibly commingled. Thus, a "factfinder will . . . need to apportion PFAS contamination between sources," *Raoul*, 111 F.4th at 849, yet "'another example of a difficult causation question that a federal court should be the one to resolve.'" *Id.* (quoting *Baker*, 962 F.3d at 945 n.3).

## **BACKGROUND**

### *The State's Action*

14.    The State filed this action on March 16, 2022, in the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, bearing Case No. 2022LA16. *See* Exhibit B, Summons and Complaint.[2]

15.    The State asserts that it brought this action to hold 3M liable "for its operation of . . . Cordova Facility in Rock Island County, Illinois" and "its discharge . . . of [PFAS] from the Cordova Facility." Exhibit C ("Am. Compl."), p. 1.

16.    The State alleges that 3M has owned and operated the Cordova Facility (located on the banks of the Mississippi River) since the 1970s, and that 3M manufactured and disposed of

---

[2] On March 21, 2025, the State filed an Amended Complaint after the state court partially granted 3M's Motion to Dismiss and dismissed the State's claims for unjust enrichment and air pollution under Section 9(a) of the Illinois Environmental Protection Act. The State repleaded these claims solely to preserve the issues for appeal.

PFAS and PFAS-containing products from the Cordova Facility, allegedly resulting in PFAS contamination of the State's environment and natural resources "at and around" the facility. *Id.* ¶ 105; *see id.* ¶¶ 34–48, 74. The State specifically alleges that 3M has discharged PFAS from the Cordova Facility into the Mississippi River (*id.* ¶¶ 105, 107–108, 129–136), and that PFAS has migrated into the environment from the Cordova Facility (*id.* ¶¶ 143, 178), causing contamination of the State's groundwater, surface waters, wetlands, and wildlife (*id.* ¶¶ 145–180), including the Mississippi River (*e.g.*, *id.* ¶ 129–136, 190–192).

17.    Among other forms of relief, the State seeks "monetary damages for the cost of identifying, monitoring, and remediating contamination caused by the release of PFAS from 3M's Cordova Facility and all damages to the State's environment and its natural resources because of the resulting contamination." *Id.* at p. 1. The State's requested damages include purported damages for all alleged contamination "at and around" the Cordova Facility (*e.g.*, *id.* ¶¶ 248, 259, pp. 55, 57), such as downstream harms caused by PFAS from the Cordova Facility, including damages to "groundwater, surface waters, wetlands, drinking water supplies, biota, wildlife, aquatic life, and their associated soils, sediments, and uses, and other State natural resources and property" (*id.* at p. 61).

18.    Based on allegations concerning 3M's manufacture and discharge of PFAS chemicals in the State of Illinois, the State asserts claims against 3M for multiple counts of violations of the Illinois Environmental Protection Act, 415 ILCS 5/1, *et seq.* (*id.* ¶¶ 181–232), for restoration under the Fish and Aquatic Life Code, 515 ILCS 5/5-5, and the Wildlife Code, 520 ILCS 5/1-10 (*id.* ¶¶ 233–244), and for negligence (*id.* ¶¶ 245–248), trespass (*id.* ¶¶ 249–259), and public nuisance (*id.* ¶¶ 260–264).

***3M's Original Removal***

19.     3M originally removed this action to this Court on April 21, 2022, asserting federal

officer jurisdiction and federal enclave jurisdiction. *See* Notice of Removal, No. 4:22-cv-04075-

SLD-JEH, ECF No. 1 (C.D. Ill.).

20.     3M alleged that "PFAS contamination of natural resources due to releases from the

Cordova Facility into the Mississippi River could plausibly overlap with PFAS contamination

identified by the U.S. Army that stems from the use, storage, or disposal of MilSpec AFFF at the

Rock Island Arsenal." *See id.* ¶ 32. Thus, "the alleged PFAS contamination for which the State

seeks recovery in this action is plausibly attributable in part to MilSpec AFFF." *Id.* ¶ 33.

21.     On April 29, 2022, the State moved to remand this action. *See* Mot. to Remand, No.

4:22-cv-04075-SLD-JEH, ECF No. 3 (C.D. Ill.). The State argued that "[t]he fatal flaw with 3M's

argument is that the People do not seek in this matter to hold 3M liable for contamination from

MilSpec AFFF that the U.S. Army discharged from the Rock Island Arsenal," so the government

contractor defense that formed the basis of 3M's removal failed. Memo. in Supp. of Mot. to

Remand, No 4:22-cv-04075-SLD-JEH, ECF No. 4 at 2 (C.D. Ill.).

22.     On September 21, 2023, this Court granted the State's motion to remand. The Court

determined that 3M satisfied each element of the federal officer removal statute except that it could

not show it was sued for or relating to an act under color of federal authority. *Illinois ex rel. Raoul

v. 3M Co.*, 693 F. Supp. 3d 948, 956 (C.D. Ill. 2023). In determining that 3M could not meet that

requirement, the Court reasoned that the State "only seeks relief for PFAS contamination from the

Cordova Facility, not for PFAS contamination from other locations." *Id.* at 957. Because the State

had "renounce[ed] all claims stemming from a contractor's work for the federal government, it no

longer becomes necessary to assert the federal government contractor defense." *Id.* The Court's holding therefore depended on the State's disclaimer in its pleading. *See id.*

23.    3M appealed to the Seventh Circuit, which affirmed this Court's remand order. However, the Seventh Circuit based its ruling not on the scope of the State's disclaimer as presented to this Court, but on "the State's concessions on appeal." *Raoul*, 111 F.4th 848.

24.    The Seventh Circuit explained that "[i]f the contamination came from AFFF, then the government contractor defense could apply" even if the State "expressly excluded 3M from liability for PFAS contamination sourced from AFFF." *Id.*  For example, the court reasoned, "if a designated area of the Mississippi River is contaminated with PFAS from both the Cordova Facility and from AFFF, then a factfinder would need to apportion the contamination between that stemming from the Cordova Facility (which would not be subject to the government contractor defense) and that sourced from AFFF (which would potentially be subject to the defense)." *Id.* This would implicate the government contractor defense, providing federal jurisdiction.

25.    However, the "State clearly and unequivocally conceded at oral argument that it would not seek relief against 3M for mixed PFAS contamination" and "agreed that a factfinder will not need to apportion the PFAS contamination between sources." *Id.* at 849. The Seventh Circuit held that these concessions took this case "outside of the scope" of *Baker*, which had found federal officer removal proper. *Id.* These concessions also distinguished this case from one in which a state seeks recovery for mixed contamination, in which case 3M could assert its federal government contractor defense. *See id.* at 848–49. As the Seventh Circuit explained, remand was appropriate here based purely on the concession that "[i]f even a morsel of contamination is not from PFAS produced at the Cordova Facility (such as AFFF out of the Rock Island Arsenal), the State's recovery is barred." *Id.* at 849.

9

***Additional Facts Relevant To This Removal***

26.    On August 28, 2025, 3M served Requests for Admission on the State. Exhibit D, ("RFAs"). On September 24, 2025, the State served its RFA Responses, which were verified by one of the State's retained experts. Exhibit E, ("RFA Responses").

27.    In response to the first RFA, the State admitted "that it is possible that there is a potential for one or more PFAS to be present at measurable amounts with one or more other PFAS in a media." RFA Responses at 4. The State disclosed for the first time that it "anticipate[s] that expert testimony will identify PFAS contamination caused by operations at the Cordova Facility . . . and that the PFAS contamination at issue in this Action can be identified and traced back to the Cordova Facility, *even if there are other contaminants* in the same media." *Id.* (emphasis added).

28.    When asked in the second RFA to admit that the State "did not seek any recovery . . . for harm . . . where any PFAS, even a morsel, derived from AFFF use or Release is present," the State responded that "the People admit *only* that they are not seeking any recovery or relief in this Action for harm or damage derived from mil-spec AFFF contamination *from the Rock Island Arsenal*." *Id.* at 5 (emphasis added). The State added that it "intend[s] to seek in this Action recovery and relief for harm and damage to Illinois' environment and natural resources at and around the Cordova Facility – including, without limitation, to the surrounding land, water, and natural resources; Landfills, Public Water Systems, Water Treatment Facilities, Wells, Resources at Issue, and/or the Mississippi River – caused by PFAS contamination from the Cordova Facility." *Id.* at 5–6. The State otherwise offered a boilerplate denial. *Id.* at 6. In other words, the State failed to deny that it would seek recovery where any PFAS, even a morsel, derived from AFFF use or Release is present.

29.    And when asked in the fourth RFA to admit that the State did not "seek any recovery . . . for harm . . . where there is PFAS derived from the use or Release of AFFF that has mixed with PFAS unrelated to the use or Release of AFFF," the State again admitted that they "are not seeking any recovery" for harm "from mil-spec AFFF contamination from Rock Island Arsenal." *Id.* at 7. The State further provided that it "believe[s] that expert testimony can identify PFAS contamination caused by operations at the Cordova Facility . . . even if other contamination is present." *Id.* The State otherwise "denied" that it would not seek to recover for mixed AFFF and non-AFFF PFAS. *Id.* In other words, the State failed to deny that it would seek to recover for mixed AFFF and non-AFFF PFAS.

30.    In the sixth RFA, the State was asked to admit that it was "unable to show that 100% of the PFAS detected at or around the Cordova Facility is derived from non-AFFF PFAS or PFAS-containing products . . . Released at or from the Cordova Facility." The State denied that the request "is consistent with their legal obligations to establish liability on the claims asserted in the People's Complaint." *Id.* at 9.

31.    Taken together, the State's verified discovery responses reveal: (1) the State does not deny that it seeks to recover where MilSpec AFFF is present; (2) the State seeks to recover for mixed contamination, including where non-AFFF and AFFF PFAS have plausibly commingled; (3) the State seeks to recover at numerous sites, including, *without limitation* the Mississippi River, where at least some contamination from the Cordova Facility is allegedly present; (4) the State intends to offer testimony to trace or apportion PFAS among sources; (5) the State no longer concedes that 100% of contamination at a site for which it seeks recovery must be sourced from the Cordova Facility or the State's recovery is barred.

32.     Following further investigation, 3M has become aware of at least one additional source of PFAS contamination from MilSpec AFFF that is plausibly commingled in the Mississippi River with PFAS from the Cordova Facility. MilSpec AFFF use at the Savanna Army Depot, which is on the banks of the Mississippi River approximately 30 miles upstream of the Cordova Facility, plausibly resulted in at least part of the contamination for which Illinois seeks to recover.

33.     The State's verified discovery responses, alongside 3M's plausible allegations that MilSpec AFFF commingled with alleged contamination from the Cordova Facility, necessarily mean that a factfinder will need to apportion PFAS contamination between that stemming from the Cordova Facility and that sourced from AFFF (which would be subject to the government contractor defense).

### THE PROCEDURAL REQUIREMENTS FOR REMOVAL UNDER 28 U.S.C. §§ 1442(a)(1) AND 1446 ARE MET

34.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 93(b) and 1442(a) because the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, is located within the Central District of Illinois.

35.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint are attached hereto as Exhibit B. True and correct copies of the documents on file in this case (including process, pleadings, and orders served on 3M) prior to the filing of this notice of removal are attached as Exhibits F & G.

36.     Removal is timely under 28 U.S.C. § 1446(b). A defendant removing a case is required to file a notice of removal within 30 days of service on it by the plaintiff of an initial pleading (28 U.S.C. § 1446(b)(1)) or other paper (*id.*, § 1446(b)(3)) that, considering "the four corners" of the document, "informs the reader, to a substantial degree of specificity, that all the

elements of federal jurisdiction are present." *McLaren v. UPS Store, Inc.*, 32 F.4th 232, 236 (3d Cir. 2022) (cleaned up); *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 824 (7th Cir. 2013) ("The 30–day removal clock does not begin to run until the defendant receives a pleading or other paper that affirmatively and unambiguously reveals that the predicates for removal are present."). Although neither the Complaint nor any other paper served by the State (including the RFA Responses), separately or together in combination, contain the information necessary to inform 3M that all of the elements of federal jurisdiction are present, 3M has nevertheless filed this notice of removal within 30 days of service of the State's RFA Responses that have made clear the State's position that its disclaimer covers only MilSpec AFFF contamination stemming from the Rock Island Arsenal to the extent such contamination commingled with contamination from the Cordova Facility. This Notice of Removal is therefore timely. *See Tooley v. Washington Grp. Inter.*, No. 08-1084, 2009 WL 102926, at *7 (C.D. Ill. Jan. 13, 2009) (notice of removal timely where defendant filed removal "within thirty days of receipt" of the plaintiff's interrogatory responses, "which established" the requisite amount in controversy for diversity jurisdiction); *Oehlman v. Wal-Mart Stores East, LP*, No. 2:06 CV 055, 2006 WL 1043465, at *3 (N.D. Ind. Apr. 19, 2006) (similar).

37.     Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon counsel for the State, and a copy is being filed with the Clerk of the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County.

38.     By filing a Notice of Removal in this matter, 3M does not waive and reserves its right to assert any defenses and/or objections to which it may be entitled.

39.     3M reserves the right to further amend or supplement this Notice of Removal.

40.    If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

41.    Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Baker*, 962 F.3d at 941; *see also Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *see also Moore v. Elec. Boat Co.*, 25 F.4th 30, 34 (1st Cir. 2022); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008).

42.    Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Durham v.*

*Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025) (noting that "'the ordinary presumption against removal does not apply' to federal officer removal" and that "[g]eneral removal principles are . . . inverted when § 1442(a)(1) is at issue") (*quoting Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021)).

43.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are—at least in part—caused by or related to MilSpec AFFF. *See, e.g.*, *The City of Irondale v. 3M Company, Inc., et al.*, No. 2:23-cv-01327-AMM, 2025 WL 2419238, at *6 (N.D. Ala. Aug. 19, 2025) (denying motion to remand and noting that for federal officer removal purposes, removal is proper so long as 3M has "put forth a **plausible** case that MilSpec AFFF is a **potential** source of [the plaintiff's] complained-of injury") (emphasis in original); *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in PFAS case against AFFF manufacturers because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV- 0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against AFFF manufacturers of MilSpec AFFF).

44.    The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that the plaintiff's injuries are caused, at least in part, by MilSpec AFFF. *See In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019) ("MDL Order 1"); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-

mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6. Given its experience with the claims and defenses in the AFFF litigation, the MDL Court's holdings demonstrate that this case, too, has been properly removed to federal court.[3]

### A.   MilSpec AFFF

45.   Since the late 1960s/early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. In fact, the United States Naval Research Laboratory developed AFFF; its researchers were granted the first AFFF patent in 1966.[4] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[5]

46.   The design and manufacture of MilSpec AFFF are governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the Department of Defense ("DoD"). The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised several times since.[6] All MilSpec AFFF products must be "qualified for

---

[3] Following removal, 3M intends to designate this action for transfer to the MDL. Although the Judicial Panel on Multidistrict Litigation previously declined to transfer this action to the MDL, the Panel has since found transfer of cases relating to the Cordova Facility to be appropriate in light of evidence that "AFFF has been used at the Cordova facility for fire suppression since 1969 and that, historically, wastewater containing AFFF was discharged, spilled, or released at the facility." Transfer Order, *In re AFFF*, MDL No. 2873, ECF No. 3420 at 1–2 (J.P.M.L. Apr. 3, 2025).

[4] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[5] U.S. Navy, NRL/MR/1001-06-8951, U.S. Naval Research Lab., *The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("*Fulfilling the Roosevelts' Vision*"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[6] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

listing on the applicable Qualified Products List" prior to military procurement.[7] Prior to such listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[8] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[9] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[10] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[11]

47.    From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors—among the compounds expressly alleged to be at issue in this action.[12] *See, e.g.*, Am. Compl. at p. 1, ¶¶ 43–44, 46–47. The current MilSpec expressly contemplates the presence of PFOA and PFOS (subject to recently

---

[7] MIL-PRF-24385F(4) § 3.1 (2020).

[8] DoD SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[9] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DoD SD-6, *supra* n.9, at 3.)

[10] DoD SD-6, *supra* n.9, at 1.

[11] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[12] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

imposed limits) in AFFF formulations.[13] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[14]

48.    3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of 3M's AFFF products were on the Navy's Qualified Products List for AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[15] Over time, the U.S. military used MilSpec AFFF manufactured by 3M throughout the United States, including in Illinois.

**B.    MilSpec AFFF Plausibly Contributed to PFAS Contamination Alleged By The State.**

*The State Has Abandoned Its Position That Served As The Basis For Remand*

49.    In its RFA Responses, the State has revealed that it means to narrow the scope of its oral argument concession that it would not seek relief against 3M for mixed PFAS contamination—*i.e.*, from any source other than the Cordova facility.

50.    At oral argument before the Seventh Circuit, the State expressly limited its theory of recovery to locations where all of the alleged PFAS contamination originated only from Cordova. When asked, "You have to prove that, whatever location you're talking about, that all of the damage there arose from Cordova and nothing else?," counsel for the State responded, "That's correct." Exhibit A at 18:8–11.

---

[13] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[14] MIL-PRF-24385F(4) § 6.6.

[15] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

51.     The State's litigation tactics on this issue, recently revealed in discovery, are directly contrary to what the State represented to the Seventh Circuit to secure the prior remand of this action to state court. The State's positions make plain that 3M has a colorable federal defense and is entitled to a federal forum to litigate it.

52.     In affirming remand of this action, the Seventh Circuit made clear that "if a designated area of the Mississippi River is contaminated with PFAS from both the Cordova Facility and from AFFF, then a factfinder would need to apportion the contamination" and the action would properly proceed in federal court. *Raoul*, 111 F. 4th at 848. However, because the State "clearly and unequivocally conceded at oral argument that it would not seek relief against 3M for mixed PFAS contamination" and "expressly agreed that a factfinder would not need to apportion PFAS contamination between sources," the Seventh Circuit found 3M could not present a colorable government contractor defense. *Id.* at 849.

53.     That is no longer the case. In its RFA Responses, the State walks back its oral argument concession to the Seventh Circuit that it would not seek relief against 3M at any sites where there is mixed PFAS contamination from sources other than Cordova. The State now attempts to limit its oral argument concession to provide only that it will not seek to recover for PFAS from MilSpec AFFF used or stored at the Rock Island Arsenal. Even that narrowed concession will, by the State's admission in its RFA Responses, require the factfinder to decide whether the State has in fact distinguished the source of PFAS in the Mississippi since the State still maintains claims for PFAS contamination in the river. But more fundamentally, this change of tack demonstrates that State does not intend to rule out PFAS contamination from any other source, including MilSpec AFFF from the Savanna Army Depot upstream from the Cordova facility. Because the State no longer concedes that it can only recover where "100% of the

contamination must be sourced from Cordova" alone, 3M will have a colorable federal defense based on plausibly commingled MilSpec AFFF and is entitled to remove the case under the federal officer removal statute to litigate the defense and challenge the State's expert testimony.

### *The State's Claims Plausibly Stem From Contamination Caused By MilSpec AFFF*

54.     As set forth below, the contamination of natural resources alleged by the State was plausibly caused by the use of MilSpec AFFF, including at the Savanna Army Depot and Rock Island Arsenal. Specifically, based on the upstream and downstream releases of MilSpec AFFF into the Mississippi River, the portions of the Mississippi River and the wildlife—for which the State seeks recovery in this case—are plausibly contaminated with PFAS from the use of MilSpec AFFF. The State's claims thus relate to or arise in part from PFAS-containing MilSpec AFFF.

55.     The Savanna Army Depot is a U.S. military facility located on the banks of the Mississippi River approximately 30 miles upstream from 3M's Cordova Facility.

56.     In February 2021, U.S. Army Corps of Engineers prepared a final site inspection report related to PFAS use and contamination at the Savanna Army Depot.[16] The "primary objective" of the Savanna Report was to "determine the presence or absence of PFOS or PFOA in groundwater" at locations at the Savanna Army Depot. Savanna Report at 1-1, 1-4.

57.     The Savanna Report noted a history of fire training activities at the Savanna Army Depot, which included the use of AFFF. The Savanna Report specifically identified the use at the facility of AFFF manufactured by 3M. *Id.* at 1-5, 3-1, 7-1.

---

[16] *See Site Inspection Report for Per- and Polyfluoroalkyl Substances at SVAD-067 – Fire Training Area and SVAD-084 – Scrap Wood Open Burn Area*, U.S. Army Corps of Engineers (February 2021), available at https://aec.army.mil/Portals/115/PFAS/SVDA_PFAS_SI.pdf?ver=jmDmDtuHGo_eZCLK30H4lg%3d%3d ("Savanna Report").

58.    The Savanna Report also explained that, at the fire training area examined, the "primary release mechanism of PFAS to the environment . . . is from the use of AFFF products to extinguish fires during firefighting training activities." *Id.* at 5-3. The report further explained that "[d]uring fire training exercises, contaminants released onto the soil subsequently would have migrated to groundwater." *Id.* And, as shown in Figure 5-2 of the Savanna Report, the predominant groundwater flow direction from the fire training area is towards the Mississippi River. *Id.* at 5-5.

59.    The Savanna Report also determined that at the scrap wood open burn area examined, the "primary release mechanism of PFAS to the environment . . . is from the use of AFFF products to extinguish burning scrap wood fires during firefighting training activities." *Id.* at 6-1. The report further explained that "[d]uring the fire training exercises, contaminants released onto the soil subsequently would have migrated to groundwater." *Id.* And, as shown in Figure 6-2 of the Savanna Report, the predominant groundwater flow direction from the scrap wood open burn area is towards the Mississippi River. *Id.* at 6-3.

60.    The Savanna Report concludes that "groundwater sampling results indicate PFOS/PFOA chemicals are present at levels exceeding" the United States Environmental Protection Agency Lifetime Health Advisory. *Id.* at 7-1.

61.    Because the Savanna Army Depot is a U.S. military facility, any AFFF used, stored, or disposed at the Savanna Army Depot would have been MilSpec AFFF.

62.    Moreover, because the Savanna Army Depot is on the banks of the Mississippi River approximately 30 miles upstream from 3M's Cordova facility, alleged downstream PFAS contamination of natural resources due to releases from the Cordova Facility into the Mississippi River plausibly overlaps with PFAS contamination identified by the U.S. Army that stems from the use, storage, or disposal of MilSpec AFFF at the Savanna Army Depot.

21

63.     The Rock Island Arsenal is a U.S. military facility located on the banks of the Mississippi River approximately 25 miles downriver from 3M's Cordova facility. The U.S. Army prepared a Preliminary Assessment and Site Inspection of the Rock Island Arsenal to investigate PFAS contamination at that facility, including contamination from PFOS and PFOA.[17]

64.     The Rock Island Report identified multiple areas of potential interest ("AOPIs") where the use, storage, or disposal of PFAS-containing materials had occurred, and determined that elevated levels of PFOS and PFOA existed in the groundwater at many of those areas. Rock Island Report at ES-1 to ES-2. Those included AFFF storage warehouses and fire training areas. *Id.*; *see also id.* at -13–14 (identifying "AFFF Use, Storage, and Disposal Areas").

65.     The Rock Island Report explains that "AFFF-use and storage was identified at nine areas" of potential interest, including firefighting training areas and AFFF storage areas where AFFF is currently stored. *Id.* at 13. The report also identified an additional site, an "Old Landfill," where burn pits "indicate[d] the use of AFFF during fire training exercises." *Id.* at 15. In addition, the report confirmed the use of AFFF during "two occurrences of the RIA Fire Department responding to offsite fires." *Id.*

66.     The Rock Island Report also describes historical evidence that "firefighting foam operations [were] conducted in the Mississippi River" and that the "foam [was] released into the Mississippi River during training exercises." *Id.* at ES-1. The report further explains that "[s]urface water runoff and/or groundwater associated with the AOPIs may discharge to the Mississippi River." *Id.* at 40, 41, 42; *see also id.* at 13 (noting that "seeps located in the Mississippi River" are

---

[17] *See Final Preliminary Assessment and Site Inspection of Per- and Polyfluoroalkyl Substances, Rock Island Arsenal, Illinois*, U.S. Army Corps of Engineers (October 2022), available at https://aec.army.mil/Portals/115/PFAS/RIA_PFAS_PASI.pdf?ver=tVBlnHZuHIWi_Qya25i16Q%3d%3d ("Rock Island Report").

"downgradient" from training areas where AFFF was used). The report acknowledges that PFAS "impacts from other sources" may have contributed to PFAS contamination of the Mississippi River from the Rock Island Arsenal. *Id.* at 29, 30.

67.    Because the Rock Island Arsenal is a U.S. military facility, any AFFF used, stored, or disposed at the Rock Island Arsenal would have been MilSpec AFFF.

68.    Moreover, because the Rock Island Arsenal is on the banks of the Mississippi River, 25 miles downriver from 3M's Cordova facility, alleged downstream PFAS contamination of natural resources due to releases from the Cordova Facility into the Mississippi River could plausibly overlap with PFAS contamination identified by the U.S. Army that stems from the use, storage, or disposal of MilSpec AFFF at the Rock Island Arsenal.

69.    The unspecified wildlife and fish for which the State seeks recovery in this case live in or consume water from portions of the Mississippi River near the Savanna Army Depot and the Rock Island Arsenal. Those wildlife and fish can and do freely move upstream and downstream and thus may be plausibly impacted by MilSpec AFFF use at the Savanna Army Depot and the Rock Island Arsenal.

70.    Accordingly, the alleged PFAS contamination in the Mississippi River and other natural resources, fish and wildlife for which the State seeks recovery in this action is plausibly attributable in part to MilSpec AFFF, and the State has attempted to limit its now ineffective disclaimer to contamination caused by MilSpec AFFF from the Rock Island Arsenal (but not the Savanna Army Depot), 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction.

**C.     <u>All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.</u>**

71.    In granting the State's motion to remand after 3M filed its first removal, this Court determined that 3M had satisfied every element of the federal officer removal statute except the

"under color of federal authority requirement." *Raoul*, 693 F. Supp. 3d at 956 ("The outcome of Plaintiff's motion to remand thus hinges on the under color of federal authority requirement.") (internal quotations omitted). Because the State has effectively abandoned its disclaimer by stating that a factfinder will be called upon to determine whether any PFAS contamination at a particular location can be attributed to MilSpec AFFF, 3M's NOR now satisfies each element of the federal officer removal statute.

### 1.    The "Person" Requirement Is Satisfied.

72.    The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes corporations. *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Isaacson*, 517 F.3d at 135–36.

### 2.    The "Acting Under" Requirement Is Satisfied.

73.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 152 (2007); *Papp*, 842 F.3d at 812.  The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (internal quotation marks omitted). "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Id.*

74.    The requirement of "acting under" a federal officer is met here because the alleged PFAS contamination at issue in this action stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself."  *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018

WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations." [18] Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5; MDL Order 3, at 3–6.

75.    In designing, manufacturing, and supplying the MilSpec AFFF at issue, 3M acted under the direction and control of federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD. [19] 3M has satisfied the "acting under" requirement. *See, e.g.*, *Nessel*, 2021 WL 744683, at *3; *Ayo*, 2018 WL 4781145, at *8–9.

---

[18] Fulfilling the Roosevelts' Vision, *supra* n. 6, at 37.

[19] *See* DoD, SD-6, *supra* n. 9, at 1.

### 3.    The "Under Color Of Federal Office" Requirement Is Satisfied.

76.    The third requirement, that the defendant's actions were taken "under color of federal office," is satisfied where there is a "nexus" between "the allegations in the complaint and conduct undertaken at the behest of a federal officer." *Moore*, 25 F.4th at 34 n.2 (quoting *R.I. v. Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50, 59 (1st Cir. 2020)). As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. To meet this requirement, "there need be only *a connection or association* between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted).[20]

77.    Here, the State's claims against 3M for alleged PFAS contamination of natural resources and property are for or relate to (at least in part) 3M's design, manufacture, and sale of MilSpec AFFF—which was designed and manufactured according to DoD military specifications and which has been used, stored, and/or released at military facilities (and elsewhere) in Illinois. *See supra* ¶¶ 45–70. As a result, the State's claims against 3M relate to their acts taken under color of federal office. *See Maryland*, 130 F.4th at 391 (nexus element satisfied where 3M "plausibly alleged that PFAS intermingled to the point that it is impossible to identify their source," such that MilSpec AFFF "contributed to at least" part of the contamination); *Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); MDL Order 1, 2019 WL 2807266, at *3 (nexus element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products . . . for which the U.S. military imposes MilSpec standards"); MDL Order 2, at 5 (nexus element satisfied where

---

[20] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

AFFF products, "for which the military imposes MilSpec standards," were the alleged cause of plaintiff's injuries); MDL Order 3, at 5–6 (same).

78.     It is immaterial that the State purports to disclaim recovery for alleged contamination stemming from AFFF. Courts "credit Defendants' theory of the case when determining whether [the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Raoul*, 111 F.4th at 848 ("If the contamination came from AFFF, then the government contractor defense could apply. This would be true even though the State's complaint expressly excluded 3M from liability for PFAS contamination sourced from AFFF."); *Maryland*, 130 F.4th at 389; *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 192 (1st Cir. 2024); *Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"); Case Management Order No. 36, *In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-mn-02873-RMG, ECF No. 7891 (D.S.C. Aug. 22, 2025) (finding efforts "to avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF" to be "contrary to law" under *Maryland*). In any case, as explained above, the State's RFA Responses have made clear that it does not intend to be bound by the concessions the Seventh Circuit found to be necessary to preclude 3M's assertion of a colorable federal defense. *See supra* ¶¶ 26–33, 49–53.

79.     As averred in this Notice of Removal, the alleged injuries arise at least in part from alleged exposure to MilSpec AFFF. Accordingly, the State's claims are "for or relating to" 3M's actions under color of federal office (28 U.S.C. § 1442(a)(1)), and 3M is entitled to remove this case as a whole pursuant to § 1442(a)(1). *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.6 (6th Cir. 2010) ("[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.").

4.        *The "Colorable Federal Defense" Requirement Is Satisfied.*

80.    The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

81.    At the removal stage, a defendant need only show that its government contractor defense is colorable—that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citation omitted); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise "colorable federal defense"). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116; *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

82.     This is particularly true here, where the State avoided federal jurisdiction by taking a position before the Seventh Circuit from which it has since retreated. Not only do the State's RFA Responses indicate that it has substantially narrowed its oral argument concession, but also the State contends it can offer expert evidence to demonstrate whether contamination was caused by MilSpec AFFF. But the Seventh Circuit rejected 3M's government contractor defense solely because "the State expressly agreed that a factfinder would not need to apportion the PFAS contamination." *Raoul*, 111 F.4th at 849. The State has now made it plain that it seeks to recover for mixed AFFF and non-AFFF PFAS contamination, and there will be presentation of disputed evidence and testimony as to the source of contamination at locations for which it seeks to recover. This necessarily gives rise to "difficult causation question[s] that a federal court should be the one to resolve'" and makes 3M's government contractor defense "viabl[e]." *Id.* (cleaned up) (quoting *Baker*, 962 F.3d at 945 n.3).

83.     Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

84.     The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It

29

created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[21] Those specifications are "reasonably precise," including in requiring the use of PFAS.[22] In addition, in the past and continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

85.     With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[23] which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

86.     Regarding the third requirement, the U.S. government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary

---

[21] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 7, *supra*.

[22] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express requirement was removed from the specification, the use of PFAS has been implicitly mandated because PFAS-containing surfactants are the only kind that enable AFFF to meet the performance requirements of the specification.

[23] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[24] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[25] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[26] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[27] In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal

---

[24] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

[25] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[26] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[27] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-2 (D.S.C.)).

toxicology studies pertaining to alleged associations between PFOA and cancer.[28] More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[29] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants,"[30] and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[31] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, 2019 WL 2807266, at *3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water").

87.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A

---

[28] *See* EPA, Revised Draft Hazard Assessment, *supra* note 25.

[29] DoD, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[30] MIL-PRF-24385F(4) § 3.2 (2020).

[31] *Id.* § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

88.    3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to the State that were caused at least in part by 3M's compliance with military specifications, the State is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

89.    The MDL Court, based on an extensive record, has found that the government contractor defense asserted by 3M and other AFFF manufacturers presents genuine issues of fact for trial. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues necessarily is "colorable."

90.    Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

WHEREFORE, 3M hereby removes this action from the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County to this Court.

Dated: October 23, 2025

Respectfully submitted,

/s/ Daniel L. Ring
Daniel L. Ring
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 923-2625
DRing@jenner.com

*Counsel for Defendant 3M Company*

## CERTIFICATE OF SERVICE

I, Daniel L. Ring, hereby certify that on October 23, 2025, a copy of the foregoing was served on counsel for Plaintiff via electronic mail and first class mail at the addresses indicated below.

Stephen J. Sylvester
Ellen F. O'Laughlin Karen Howard
OFFICE OF THE ILLINOIS ATTORNEY
GENERAL
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, IL 60602
stephen.sylvester@ilag.gov
ellen.olaughlin@ilag.gov
karen.howard@ilag.gov

Adam J. Levitt
Daniel Rock Flynn
Amy E. Keller
Diandra Debrosse Zimmerman
Anna Claire Skinner
Elizabeth Carpenter
James Crisafulli
Special Assistant Attorneys General
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
akeller@dicellolevitt.com
fu@dicellolevitt.com
askinner@dicellolevitt.com
ecarpenter@dicellolevitt.com
jcrisafulli@dicellolevitt.com

Joseph M. Callow, Jr.
Gregory M. Utter
Special Assistant Attorneys General
Callow & Utter, LLC
8044 Montgomery Road, Suite 170
Cincinnati, OH 45236
jcallow@callowandutter.com
gmutter@callowandutter.com

Richard W. Fields Martin Cunniff
Special Assistant Attorneys General
FIELDS HAN & CUNNIFF LLC
1700 K. Street NW, Suite 810
Washington, DC 20006
fields@fhcfirm.com
martincunniff@fhcfirm.com

/s/ *Daniel L. Ring*
Daniel L. Ring
*Counsel for Defendant 3M Company*